TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00144-CV






John Dean, Appellant



v.



Max L. Gouverne and Ramakrishna Mulukutla, Appellees






FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT


NO. B-98-0297-C, HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING






 Appellant John Dean appeals the judgment of the trial court in favor of appellees
Dr. Max L. Gouverne and Dr. Ramakrishna Mulukutla (collectively "the doctors") in Dean's suit
on a promissory note. The case was tried to the court without a jury, following which the trial
court rendered a take-nothing judgment against Dean.(1) Findings of fact and conclusions of law
were filed by the trial court. On appeal, Dean asserts that the doctors, as partners in a
partnership, agreed to assume the debt of the corporation, which acted as managing partner, and
that the partnership agreement was retroactive to the day before the closing on the promissory
note. We will affirm the judgment of the trial court.


FACTUAL AND PROCEDURAL BACKGROUND

 In 1993, Red Line Burgers, Inc. (hereinafter "the Corporation") owned and operated
fast-food restaurants in the State of Texas. On September 3, 1993, the Corporation contracted to
purchase three drive-through hamburger restaurants, two in San Angelo and one in Abilene, that
were owned by Hamburgers Unlimited, Inc., of which John Pearcy was the president. The closing
of the sale of these restaurants was on September 28, 1993. At the closing, a note (hereinafter the
"Pearcy note") in the amount of $411,951.13 and dated September 17, 1993 was signed by Charles
Hatch as president of the Corporation for the purchase of the three restaurants. The payee of this
note was Hamburgers Unlimited, Inc.

 Some months after the purchase of the restaurants, the Corporation decided that it
needed capital to convert the three restaurants from their previous status as "Short Stop"
Restaurants to operate under the name and signage of "Red Line." Because the Corporation
needed between $100,000 and $200,000 of additional capital to do that, it formed a partnership
known as Red Line/West Texas Joint Venture (hereinafter "the Partnership"). When the
Partnership was established, the agreement was that individuals would loan money to the
Partnership and that the Corporation would supply, for the use of the Partnership, the three
restaurants it had previously purchased with the Pearcy note. The Partnership also agreed that the
Corporation would operate the restaurants as managing partner for the Partnership and that the
Partnership would share the profits and losses. Dr. Mulukutla loaned $30,000 to the Partnership
and Dr. Gouverne loaned $100,000 to the Partnership. There were other doctors involved in
funding the Partnership, but they were not parties to this suit. The partnership agreement was
signed by the appellees on January 24, 1994.

 The partnership agreement stated that the purpose of the Partnership was to
"acquire, develop and operate double drive-through hamburger restaurants in . . . West Texas." 
In the first paragraph of the agreement, the Corporation was named the managing general partner
of the Partnership. Article 8 of the agreement provided that the managing general partner alone
had "full, exclusive and complete authority and discretion to manage, control and direct, and shall
make all decisions affecting the partnership, the operation of the restaurants . . . except as
otherwise stated in this article." (Emphasis added.) The authority of the managing general partner
was expressly restricted in section 8.5 of the agreement as follows:


Without the prior consent of the Non-Managing General Partners . . . the
Managing General Partner shall not:


. . . .


(g) Pledge, mortgage or otherwise hypothecate any assets of the Partnership as
security for any loan to the Partnership without the written consent of the Non-Managing General Partners;


(h) Enter into any contract or agreement to purchase or sell on behalf of the
Partnership any property, except in the ordinary course of business of the
Partnership;


(i) Enter into any contract or agreement to borrow on behalf of the Partnership
from any person or entity any funds, except for credit accounts with trade
vendors opened in the ordinary course of business of the Partnership;


(j) Execute and deliver any promissory note, negotiable instrument, assignment,
deed, conveyance, pledge, deed of trust, mortgage, security agreement,
brokerage or commission agreement, instrument or document of any kind or
nature purporting to bind the Partnership; . . .

(Emphasis added.)

 According to the doctors, the restaurants were purchased by the Corporation and
were never transferred to any other entity. The Partnership did not exist when the Corporation
purchased the restaurants. 

 In January 1995 the partners transferred their interests in the Partnership in
exchange for stock in a new corporation, Red Line Burgers, Inc., a Nevada corporation. The
operation of the restaurants did not go well, and on August 21, 1995 the Partnership filed a
voluntary bankruptcy petition. This was part of a bankruptcy proceeding that was filed by Hatch
as president of Red Line Burgers Inc., the managing general partner of the Partnership. The
Partnership filed its bankruptcy petition in coordination with a bankruptcy proceeding the
Corporation filed for itself and the Corporation's numerous other joint ventures, including the
Nevada corporation. In the Partnership's petition, the purpose of the Partnership was listed as
"Operates Red Line Burgers Restaurants."

 During this time, Pearcy endorsed the note over to Dean, and Dean foreclosed on
the collateral. At the foreclosure sale, Dean bought the Pearcy note. Hatch listed the Pearcy note
as a debt in the bankruptcy proceeding, which was extinguished when the bankruptcy plan was
confirmed. The Partnership was ultimately dismissed from bankruptcy for various administrative
reasons, and a Nunc Pro Tunc Order was entered in the bankruptcy court as to Red Line Burgers
Inc.

 Dean appeals the judgment of the trial court by fifteen issues. His general
complaints are that (1) the Partnership agreed to assume the debt of Red Line Burgers, Inc. and
(2) there was a retroactive creation of an agency for an undisclosed principal. For convenience,
the issues will be considered as much as possible in groups with the same general complaint and
standard of review.


STANDARD OF REVIEW


 A trial court's findings of fact are reviewable for legal and factual sufficiency of
the evidence by the same standards that are applied in reviewing the legal and factual sufficiency
of the evidence to support a jury verdict. Anderson v. City of Seven Points, 806 S.W.2d 791, 794
(Tex. 1991). The standards for review of legal and factual sufficiency are well established. A
party attempting to overcome an adverse fact finding as a matter of law must surmount two
hurdles. First, the record must be examined for evidence that supports the finding, while ignoring
all evidence to the contrary. Second, if there is no evidence to support the finding, the entire
record must then be examined to see if the contrary proposition is established as a matter of law. 
 Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). Therefore, we are to inquire
only whether any evidence was presented at trial that tends to support the trial court's finding. 
When we review an "insufficient evidence" or factual sufficiency challenge, we consider, weigh,
and examine all of the evidence, whether it supports or contradicts the trial court's finding. 
Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the trial
court's judgment only when the evidence standing alone is too weak to support the finding or the
finding is so against the overwhelming weight of the evidence that it is manifestly unjust and
clearly wrong. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).


DISCUSSION

 Dean argues that the evidence supporting the trial court's findings of fact is legally
and factually insufficient. He states that the trial court's decision might have been based on
misconceptions of his causes of action and the applicable law. Dean further asserts that the trial
court made several findings of "no-evidence" with respect to issues that are not elements of Dean's
causes of action. As to his first ground for liability, Dean argues in nine issues that the
Partnership agreed to assume the debt of the Pearcy note in order to acquire the ability to make
large profits from operating the three restaurants. He argues that the evidence, which includes
accounting documents, federal tax returns for 1993-1994, and the voluntary bankruptcy petition,
shows that the Partnership, through the acts of its managing partner, agreed to be liable for the
indebtedness of the Pearcy note. Dean contends that both he and the doctors agreed that the
Partnership intended to acquire the right to operate the three restaurants. According to Dean, the
two key issues are (1) whether the managing partner had authority to bind the Partnership to
assume the debt, and (2) whether this implied agreement falls within an exception to the Statute
of Frauds.


Agreement to Assume the Debt

 Dean's first issue asserts that the trial court erred in its third finding of fact when
it found that:


There is no evidence to support a finding that [the Partnership] or an agent on
behalf of [the Partnership] ever promised orally or in writing to assume the debt of
[the Corporation]. Furthermore there is no evidence of any consideration given by
Hamburgers Unlimited, John Pearcy or John Dean in exchange for a promise by
[the Partnership] to assume responsibility for the debt of [the Partnership]. 
Plaintiff is not entitled to recovery under this theory.(2)


Dean argues that the trial court erred as a matter of law because the finding impliedly concludes
that an agreement to assume a debt must be expressed orally or in writing. An agreement to
assume a purchase-money debt need not be expressed orally or in writing; it may be inferred from
the circumstances. Parties form a binding contract when the following elements are present: (1)
an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the
minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with
the intent that it be mutual and binding. Buxani v. Nussbaum, 940 S.W.2d 350, 352 (Tex.
App.--San Antonio 1997, no writ); Smith v. Renz, 840 S.W.2d 702, 704 (Tex. App.--Corpus
Christi 1992, writ denied). In a contract implied in fact, which is the same as an express contract
except for the manner of proof,(3) the element of mutual assent can be inferred from the
circumstances of the transaction. Buxani, 940 S.W.2d at 352 (citing Haws & Garrett Gen.
Contractors, Inc. v. Gorbett Bros. Welding Co., 480 S.W.2d 607, 609 (Tex. 1972)); University
Nat'l Bank v. Ernst & Whinney, 773 S.W.2d 707, 710 (Tex. App.--San Antonio 1989, no writ). 
Mutual assent can arise from the parties' acts and conduct from which one party can "reasonably
draw the inference of a promise." Buxani, 940 S.W.2d at 352 (citing Haws & Garrett, 480
S.W.2d at 609-10). An implied contract arises from the dealings of the parties, from which the
facts show that the minds of the parties met on the terms of the contract without any legally
expressed agreement thereto. Angeles v. Brownsville Valley Reg'l Med. Ctr., Inc., 960 S.W.2d
854, 859 (Tex. App.--Corpus Christi 1997, pet. denied).

 By his sixth issue, Dean contends that the trial court erred in its fourth finding of
fact, which states: "The Court finds that the listing of the [Pearcy note] to Hamburgers Unlimited
was a unilateral act by [the Corporation] and was never ratified by the [Partnership]." Dean
argues that the bankruptcy record shows the filing to be by the Partnership, bears the signatures
of Charles Hatch and the Partnership's attorney, and contains Hatch's sworn oath that the
Partnership authorized the filing.

 Jim Lindsey, controller of the Corporation, testified that he prepared the accounting
and tax records for the Partnership. He stated that the intent was to put the Partnership in the
shoes of the Corporation with respect to the three restaurants so that the Partnership would actually
own the restaurants. Lindsey also testified that at the direction of Hatch, he transferred the
promissory notes, including the Pearcy note, from the Corporation's books to the Partnership's
books. Lindsey stated that in 1994 the Partnership paid all of the installments on the Pearcy note
and that the Partnership and the Corporation listed the Pearcy note as an outstanding liability of
the Partnership. Lindsey testified that the Partnership listed the Pearcy note as a liability on its
federal tax return and that it was included in computing each partner's share of liabilities for the
purpose of the schedule K-1. Lindsey also testified that he believed if the Partnership had filed
a different voluntary bankruptcy petition, one in which the Pearcy note was not listed as a debt,
it would have been inaccurate. He stated that the Partnership paid restaurant expenses, including
labor and food costs, ad valorem taxes assessed on the facilities, and sales tax.

 John Pearcy, president of Hamburgers Unlimited, Inc., testified at trial that he was
never told by the doctors or any other representative of the Partnership that the Partnership would
be liable for or agree to assume the debt of the Pearcy note. Hatch testified that he signed the note
to purchase the restaurants for the Corporation and that the title to the restaurants was never
transferred to anyone else. He also stated that at the time he purchased the three restaurants and
signed the note, he was not buying them for the Partnership. Hatch testified that he and the
doctors never intended for the doctors to own the restaurants or assume any obligations with
respect to the restaurants or the debts; the doctors' only responsibility was to loan money to the
joint venture and share in the profits. After buying the Pearcy note at the foreclosure sale, Dean
never received any payments on the note from either the Corporation or the Partnership. 

 The doctors testified that they were unaware that the Pearcy note existed until they
were sued. The doctors also testified that they did not know the amount of the note or what the
note was used to purchase. Dr. Mulukutla stated that the $30,000 he invested in the venture was
only for operating the restaurants, not for purchasing them. The doctors also argue that the record
shows that the intent was for the Partnership to operate the restaurants, not to assume any debt or
obligation incurred by the Corporation on any notes for the purchase of those restaurants. In
addition, they argue that the obligation on the purchase debt and ownership of the restaurants was
to remain with the Corporation. Finally, no one mentioned at closing that these restaurants were
being purchased by the Corporation for a partnership or any entity other than the Corporation.

 The voluntary bankruptcy petition bears the signatures of Hatch and the
Partnership's attorney. However, this evidence does not prove conclusively that the Partnership
intended to be liable for the Pearcy note. Dean argues that the intent in preparing the accounting
and tax records and the bankruptcy petition was to put the Partnership in the shoes of the
Corporation with respect to the three restaurants. Dean states that "[a]cting in two capacities, [the
Corporation] made that agreement with itself. As obligor for the indebtedness represented by the
Pearcy note it agreed with itself as managing partner for the partnership that the partnership would
assume liability for that indebtedness." This, he says, is the evidence supporting the implied
contract and meeting of the minds that was formed by the parties' act and conduct.

 After reviewing all the evidence tending to support the trial court's findings, and
ignoring all evidence to the contrary, we conclude that the evidence is legally sufficient to uphold
the trial court's ruling. Dean also asserts that the evidence is factually insufficient. We have
reviewed all of the evidence and determine that the court's finding is not so against the great
weight and preponderance of the evidence as to be manifestly unjust. Therefore, we overrule
Dean's first and sixth issues.

 Dean contends in his fifth issue that the trial court erred in its third finding of fact, 
which stated that "[p]laintiff is not entitled to recovery under this theory." "This theory" refers to
whether the Partnership ever agreed to assume the Pearcy note. Dean argues that this finding is
too vague and lacking in specificity to be a finding of fact or conclusion of law, and therefore, the
evidence supporting this finding is legally and factually insufficient. Rule 298 of the Texas Rules
of Civil Procedure provides an avenue by which a party may request specified additional or
amended findings or conclusions. Tex. R. Civ. P. 298. Where the appellant fails to make such
a request timely in accordance with Rule 298, that failure is a waiver of any error on the part of
the court to make complete findings and a waiver of the right to complain of the trial court's
failure to make certain findings deemed necessary by the appellant. Lettieri v. Lettieri, 654
S.W.2d 554, 556 (Tex. App.--Fort Worth 1983, writ dism'd). Assuming that Dean preserved this
issue for appeal, we conclude that it is without merit. We overrule Dean's fifth issue.

 Dean argues in his seventh issue that the trial court erred in its fourth finding of fact
"by failing to note that the March 11, 1997 bankruptcy order specifically provided in Subsection
(j) of section 35, . . . '[w]ith respect to the claims of John Dean the liability of any third parties
on the debt shall remain unaffected by the Amended Liquidating Plan and this order,' when the
trial court stated that the 'Nunc Pro Tunc Order Confirming First Amended Liquidating Plan of
Reorganization . . .' barred claims against [the Corporation]." Dean has raised no specific reason
why such failure constitutes error. To the extent this issue was properly raised and not waived
by insufficient briefing, we conclude it is without merit. We overrule Dean's seventh issue.


Authority to Bind Partnership

 Dean's fourth issue states that the trial court erred in its first finding of fact: "The
Court finds no credible facts to support evidence that [the Partnership] entered into an agreement
with [the Corporation] to assume [the Corporation's] indebtedness to Hamburgers Unlimited." 
Dean argues that as a matter of law the trial court misconstrued key provisions of the managing
partner's authority in the partnership agreement. Moreover, he asserts that such finding is against
the great weight and preponderance of the evidence.

 It is well established that partners are charged with a fiduciary duty. Hughes v. St.
David's Support Corp., 944 S.W.2d 423, 425 (Tex. App.--Austin 1997, writ denied). In addition,
a managing partner owes his partners one of the highest fiduciary duties recognized in the law and
an even greater duty of loyalty than is normally required. Huffington v. Upchurch, 532 S.W.2d
576, 579 (Tex. 1976). There is also a presumption that a partner may act as an authorized agent
within the scope of his authority to bind the partnership. Metroplex Glass Ctr., Inc. v. Vantage
Props., Inc., 646 S.W.2d 263, 266 (Tex. App.--Dallas 1983, writ ref'd n.r.e.); Brewer v. Big
Lake State Bank, 378 S.W.2d 948, 951 (Tex. Civ. App.--El Paso 1964, no writ). Generally a
principal will be liable for the acts of its agent only if the acts are within the agent's authority or
if the principal ratifies the acts. See Elliot Valve Repair Co. v. B.J. Valve & Fitting Co., 675
S.W.2d 555, 560-61 (Tex. App.--Houston [1st Dist.]), rev'd on other grounds 679 S.W.2d 1
(Tex. 1984). If an agent acts within the scope of his authority, both the agent and the principal
may be liable. Wynne v. Adcock Pipe & Supply, 761 S.W.2d 67, 69 (Tex. App.--San Antonio
1988, writ denied).

 In the present case, the partnership agreement restricts the managing general
partner's authority to act on behalf of the Partnership in certain ways, including prohibiting the
managing general partner from executing and delivering "any promissory note, negotiable
instrument, assignment, . . . or document of any kind purporting to bind the Partnership" without
the prior consent of the non-managing general partners. Dean argues that the partnership
agreement did not prohibit the managing partner from assuming a pre-existing debt. He urges that
assuming a pre-existing debt is not the same as signing a promissory note or negotiable instrument
and the partnership agreement's restriction on the latter does not prohibit the former. According
to Dean, the managing partner had the authority to assume the Pearcy note because it was
authorized to purchase property for the Partnership in the ordinary scope of business. Dean states
that what constitutes the "ordinary course" of business depends on the scope of a partnership's
business and what is necessary to carry on that business, and therefore varies from partnership to
partnership. Furthermore, Dean asserts that the express, limited, and sole purpose of the
Partnership was to "acquire, develop and operate double drive-through hamburger restaurants." 
According to Dean, "[w]hether the managing partner acquired merely the right to operate the 3
restaurants in San Angelo and Abilene, or acquired the restaurant assets outright, it had authority
to do so and bind the partnership for the debt it assumed in connection with the purchase."

 Dean cites Dobie v. Southern Trading Co., 193 S.W. 195 (Tex. Civ. App.--Fort
Worth 1917, no writ), in which the court held that the partner had the authority to commit the
partnership to purchasing a sawmill and assume the pre-existing debt as part of consideration for
that purchase. Id. at 196-97. However, the court also held that the testimony of one of the
partners showed that all the partners had waived any restrictions or limitations on the partners set
forth in the partnership agreement, and that such waiver is permissible. Id. at 197. In addition,
the court concluded that the transaction was within the scope or apparent scope of the partner's
authority, and that the subsequent acceptance and use of the mill on the part of the other partners
amounted to a ratification of the partner's act. Id.

 Dean also cites to Corinth Joint Venture v. Lomas & Nettleton Fin. Corp., 667
S.W.2d 593 (Tex. App.--Dallas 1984, writ dism'd), where the court held that a partner could
commit the partnership to extending the maturity of a million dollar debt owed by the partnership. 
Id. at 597. However, the purpose of the joint venture in Corinth was "to own and to develop the
property in question." Further, the court concluded, "a partner has the authority to borrow money
and to give promissory notes if related to the usual business of the partnership." Id.

 Dobie and Corinth are distinguishable on their facts. In the present case, the
doctors did not waive the limitations in the partnership agreement, nor did they ratify the
assumption of the Pearcy note; they did not even know the Pearcy note existed until this lawsuit
was filed. The doctors testified that their intention and the purpose of the Partnership was not 
to purchase and own restaurants, but rather to operate them. Moreover, Dean did not prove
conclusively that assuming the Pearcy note was within the scope of the managing partner's actual
or apparent authority.

 After reviewing the evidence, we conclude that Dean did not prove as a matter of
law that the trial court erred in its ruling. In addition, we conclude that the trial court's ruling was
not against the great weight and preponderance of the evidence. We overrule Dean's fourth issue.


Statute of Frauds

 The doctors also argue that Dean has waived his Statute of Frauds arguments. In
the first three findings of fact, the trial court found that there was no agreement, either implied or
express, that the Partnership would assume the debt of the Pearcy note. The Statute of Frauds
does not address the existence of an agreement or contract, but rather requires that certain types
of agreements must be in writing before they can be legally enforced. See Tex. Bus. & Com.
Code Ann. § 26.01 (West Supp. 2000). Accordingly, where there is no agreement, implied or
otherwise, there is no Statute of Frauds issue to address. The trial court's decision was proper and
we overrule Dean's second, third, and eighth issues.


Ownership of Restaurants

 By his ninth issue, Dean asserts that the trial court erred in its first finding of fact
by finding that "[the Partnership] did operate restaurants at locations owned by [the Corporation]." 
Dean does not disagree that the Partnership operated the restaurants. He disagrees with the
finding that the Corporation owned these locations in its individual capacity, as opposed to its
capacity as managing general partner for the Partnership. In light of our previous discussion and
analysis of the testimony and evidence, we conclude that Dean has not proven conclusively that
the Partnership owned or intended to own the three restaurants. Dean also asserts that the
evidence supporting the trial court's finding on this issue is factually insufficient. We have
reviewed all the evidence and conclude that it is not against the great weight and preponderance
of the evidence. We overrule Dean's ninth issue.


Retroactive Creation of Agency for Undisclosed Principal

 Dean's tenth issue on appeal asserts that the trial court erred by finding in its fifth
finding of fact that "[the Corporation] was not acting as an agent for undisclosed principal for [the
Partnership] when it purchased Hamburgers Unlimited and that no fiduciary relationship existed
on the date of the transaction which [Dean] seeks to enforce." According to Dean, if read
narrowly, as a description of actual, real-time events that had occurred through the transaction date
of September 28, 1993, this finding is correct; however, Dean states, it is irrelevant to his cause
of action that the agent for undisclosed principal relationship was retroactively created and by
agreement extended back to the transaction date. Dean argues that if the trial court's finding is
read broadly, denying that in January 1994 the Partnership retroactively made the Corporation its
agent for undisclosed principal in the September 28, 1993 restaurant acquisition, it is legally and
factually insufficient. 

 Dean relies on Jim Lindsey's testimony to argue that because the partnership
agreement was back-dated to be effective the day before the closing on the Pearcy note, the
Partnership is liable for the note. However, the partnership agreement specifically restricts the
managing partner's authority and prohibits it from executing and delivering "any promissory note,
negotiable instrument . . . or document of any kind or nature purporting to bind the Partnership"
without the consent of the other general partners. Moreover, there is evidence that the purpose
of the Partnership was not to purchase the three restaurants, but rather to operate them.

 Although there appears to be some circumstantial evidence that the Corporation
acted as an agent for undisclosed principal for the Partnership, Dean still has not proven as a
matter of law that this was the case. There is ample evidence to support the trial court's finding
that no retroactive creation of an agency relationship occurred. Dean's tenth issue is overruled.

 By his eleventh issue, Dean argues that the trial court erred in its fifth finding of
fact, in which it found that "the note in question was entered into on September 17, 1993." Dean
states that the evidence supporting this finding is legally and factually insufficient. He argues that
the payee, Hamburgers Unlimited, Inc., received delivery of the note at the closing of the sale on
September 28, 1993; that is when the note was entered into by both maker and payee and when
delivery created an obligation between them. We have already concluded that there is more than
a scintilla of evidence to support the trial court's finding that there was no retroactive creation of
an agency for an undisclosed principal. Thus, whether the Pearcy note was entered into on
September 17 or September 28, 1993 is immaterial. We overrule Dean's eleventh issue.

 By his twelfth issue, Dean contends that the trial court erred in finding that Dean
was not a proper party to attempt to enforce any type of breach of fiduciary relationship. By his
own admission, Dean concedes that this finding was irrelevant. Dean gives no other argument
explaining why this finding constitutes harmful error. Therefore, we overrule Dean's twelfth
issue.

 Dean's final three issues complain generally of the legal and factual insufficiency
of the evidence to support the trial court's findings of fact. To the extent that these issues were
properly raised and not waived by insufficient briefing, we conclude they are without merit. 
Dean's thirteenth, fourteenth, and fifteenth issues are overruled.


CONCLUSION

 Having found no reversible error, we affirm the trial court's grant of summary
judgment.



 

 J. Woodfin Jones, Justice

Before Chief Justice Aboussie, Justices Yeakel and Jones*

Affirmed

Filed: January 19, 2001

Do Not Publish














* Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment. See
Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).

1. The original judgment recited that three defendants were present at trial and that Dean take
nothing against the three defendants. Since Dean had only sued two defendants, he filed a Motion
to Correct the Judgment, and the trial court subsequently signed a Judgment Nunc Pro Tunc
naming only two defendants.
2. Even though the trial court's findings of fact and conclusions of law were worded as "no
evidence," we will construe them as a failure to find based on a preponderance of the evidence,
which is the traditional trial court standard.
3. A contract implied in fact creates a fact question; therefore, we review it to determine
whether the trial court's ruling was against the great weight of the evidence so as to be manifestly
unjust. See Buxani v. Nussbaum, 940 S.W.2d 350, 352 (Tex. App.--San Antonio 1997, no writ)
(citing Hallmark v. Hand, 885 S.W.2d 471, 476 (Tex. App.--El Paso 1994, writ denied)).


the Partnership retroactively made the Corporation its
agent for undisclosed principal in the September 28, 1993 restaurant acquisition, it is legally and
factually insufficient. 

 Dean relies on Jim Lindsey's testimony to argue that because the partnership
agreement was back-dated to be effective the day before the closing on the Pearcy note, the
Partnership is liable for the note. However, the partnership agreement specifically restricts the
managing partner's authority and prohibits it from executing and delivering "any promissory note,
negotiable instrument . . . or document of any kind or nature purporting to bind the Partnership"
without the consent of the other general partners. Moreover, there is evidence that the purpose
of t